Mark Trachtenberg on behalf of Nitixis Funding Corporation, the appellant which I'll refer to as NFC. We're asking this court to vacate the judgment below and remand NFC's four New York law contract claims back to New York State Court because there is no subject matter jurisdiction here and, even if there was, mandatory abstention was required. If this court reaches the merits, it should reinstate each of NFC's four contract claims. Despite GENMA's promise that this transaction would be risk-free to NFC, NFC suffered an immediate massive liability and GENMA obtained a $45 million windfall as a result of GENMA's broken promises and a mutual mistake in the party's contract. Given my limited time, I'm going to focus on two issues. First, the lack of subject matter jurisdiction, and second, the improper summary judgment on NFC's warranty claim. Of course, I'm happy to address any question that the panel has on any topic. First turning to subject matter jurisdiction, the parties agree that the board exacting post-confirmation test for related to jurisdiction applies, so that means the question before this court is whether this lawsuit, at the time it was removed, pertained to the implementation or execution of the GENON bankruptcy plan that had already been confirmed five months earlier. It most certainly did not. The confirmed plan for GENON, which was an entity five steps up the corporate ladder from GENMA, does not mention this lawsuit and was never amended to include such a reference. But the lawsuit risked GENMA's ability to perform the settlement which was necessary to its parents' reorganization, so I don't know how you can say that it wasn't related to. Certainly, I know related to is a term of art, but certainly in the common sense use of the term related to, it had a relationship to it. Well, there was no evidence that it could have, and you're talking about the relevant time frame here. We filed the lawsuit. It was removed in April 2018, and in the removal papers, they're saying this bankruptcy is going to be consummated just a few months later, in the third quarter of 2018. In the remand briefing, when they identified the conditions precedent to plan consummation, they mentioned two other things but don't mention this plan. The idea that this plan could, this lawsuit, could result in a judgment that would get through final appeals in the very short time that remained between removal and plan consummation just defies reason, and in fact, JEMMA's plan was substantially consummated in 2018, two and a half years before the bankruptcy court adjudicated NFC's claims in this case, and if the ownerless owners who were the beneficiaries of the JEMMA settlement had any concern that this lawsuit would interfere with the implementation or execution of the plan or their settlement, you would think that they would have gone and amended the plan to make it a condition of that plan that this case would be resolved in some way or taken care of as part of the plan, but they did no such thing. There are no precedents that I've seen that are a complete fit for what we're dealing with here, but there's language, unfortunately, for each side in several of these opinions, so how to make this work, but Zales concerns me. It was allowed, the claims were allowed to be brought there. Among the statements was that there is an effect not, there is an effect on the estate, not merely on the debtor, and the proponent of these new claims said that it would affect the implementation of the plan. Help me with Zales, why does that not at least weigh in I think the point that we cited Zales for, I'm a little fuzzy on the details there, but the point was that just simply a factual overlap between claims doesn't give rise to related to jurisdiction, and my recollection of that case was, well, that was what our focus on that case was, and I think that's what happened here with the bankruptcy court. The bankruptcy court certainly had a claims estimation proceeding where there was some factual overlap, very little factual overlap between the owner lessor's claims and the claims that are brought here, but that doesn't affect the bankruptcy estate, and that doesn't give rise, that doesn't satisfy the implementation or execution of the bankruptcy court plan. I think to reach that level of the post-confirmation test, you look to a case like Enright U.S. Brass, for example, where there was, it was in the post-confirmation setting, and there the bank, there the change to the plan, there was a direct change to the plan that had contemplated litigation as the means to bring claims against the, so look like you're about to speak, Your Honor. Anyway, Enright Brass was a direct change to the confirmed plan, and that was the type of case you need to see for the related to test being satisfied. But the other argument that they... Let me stop you there. You make the end point, the confirmation of the plan, and it certainly is case law, and significant case law to that effect, Craig Storrs, but you're just talking about U.S. Brass, and U.S. Brass was talking about the plan being fully consummated. In my understanding, at least in the facts of your case, the case before us, your friend's case, too, on the other side, is there were problems in consummating this plan after confirmation. There were difficulties in making the pieces fit, and that's why whatever length of time you know better than I, after confirmation, you still had not, the bankruptcy was still open. So the effect on the ability of Jim Ma to perform under the confirmation plan, it seemed to me, was of significant concern to the bankruptcy judge. It seems like each new case after Craig Storrs, we've expanded or changed it a little bit. It does seem to me that that interregnum between confirmation and consummation is important in figuring out whether these other claims are going to interfere with the bankruptcy, and just as a practical matter. So why is confirmation so important? Confirmation is where the party's interests are fixed under the confirmed plan, and the question from that point forward, according to not just this court's precedent, but the second, third, fourth, eighth, and ninth circuits have all demarcated confirmation as the switch point between the more lenient conceivable effects test and the more rigorous, more exacting standard. In the other circuits, it's the close nexus test, and this circuit has described it in an opinion that you joined, Judge Southwick, in Rae 7Cs, that talks about implementation or execution. And it makes sense, Your Honor, because I think once confirmation takes place, that's the concern. Is there something that's going to interfere with the implementation, execution, completion, consummation of the plan? But we think we have a pre-confirmation standard here. We don't think the judges, and again, it's the Southern District of New York that was making this decision in a one-page order, not the bankruptcy judge here. But in any case, those findings were entirely conclusory. There was no explanation given for why the JNMA, why this lawsuit could possibly interfere with the JNMA settlement. And I'll reiterate just the timing involved here. Again, we had filed and our case was removed in April 2018, and they're talking about consummating the bankruptcy just a few months later. The idea that this case would get to judgment and bankrupt JNMA and interfere with the plan just doesn't make sense. And the other aspect of that is, again, you would think that if anybody was concerned about that settlement, they would have made it a condition of consummation. The under-law source would have come in and said, we don't think JNMA can complete this plan if this threat is out there, so we want this threat resolved. They didn't do any of that. I think I want to also make sure, address abstention too, Your Honors. There's concerns with subject matter jurisdiction, but under 1334 C.2, even if there was related to jurisdiction, we believe mandatory abstention should have been granted here by the Southern District of New York. And there are really only two contested factors here. The first is whether this case could have been timely adjudicated in New York State Court. And these are New York law claims that were before the New York Commercial Division in State Court. And in fact, we know that the New York State Court resolved these claims, and it went all the way through the New York appellate system and much faster than the Bankruptcy Court even reached the law, these claims here, once there was a split. The timely adjudication factor, according to case law in the circuit, is a very low bar. It's a low threshold. And the question is not whether the State Court could have moved faster than the Federal Court. It's whether it could have been timely adjudicated in the State Court. So we think that factor, one of the two contested factors on that, clearly favors our side. The second contested factor on abstention is whether the lawsuit, whether the action could have been commenced in Federal Court, whether there was another basis for federal jurisdiction. And here you look to the action that was filed. There were non-diverse parties on both sides of the V in the lawsuit that included the unrules orders in New York. And so there was no basis for that. I'm not sure that's true. The question is whether the claims could have started in the Southern District of New York. And as you know, the bankruptcy statute is more lenient than the general diversity statute. It doesn't have to be the whole case, but it could, whether that particular claim has diverse parties. And here it did. Well, because they only plucked out those two claims. So there's jurisdiction. They brought what they brought. And there was jurisdiction in the Southern District in the Federal Court. Our view is the statute looks at the action and not the claims. And in the action that was filed included non-diverse parties. And the only case authority we could find that going any one way or the other on this was the Bryson case out of the Eastern District of Texas. And that case looked at it as not what the hypothetical lawsuit that could have been brought, but rather the actual lawsuit that was brought. I want to turn to make sure I leave myself some time to talk about the merits and in case this Court reaches them. And I want to turn to our claim that GENMA breached warranties in its arrangement with NFC. That it breached warranties that its arrangement with NFC would not violate pre-existing contractual commitments that it owed to the owner-less owners. And there are really two distinct claims here because GENMA violated two different covenants of the sale-leaseback agreements. It violated a prohibition on the use of a deposit arrangement and it breached an affirmative covenant by violating Section 5.13's requirement that any qualifying credit support be uncollateralized, meaning not collateralized by GENMA's own assets. The Bank of Support did not address the first claim at all, but it addressed the second one in only cursory and erroneous fashion. When we talk about the first breach claim first, Section 6.3 of the sale-leaseback agreements prohibited GENMA from causing a lien to exist on its assets. And a lien was defined very broadly to include a deposit arrangement of any kind to secure payment of a debt or performance of an obligation. But the key word there is secure, isn't it? I'm sorry? The key word there is that it must secure. You're saying there's a security of application or what? I'm saying that the $130 million was precisely designed to secure the payment of a debt, which was GENMA's rent that it owed to the owner of SORS, or it had to secure the performance of an obligation, which was GENMA's credit support obligations that it owed to the owner of SORS. And GENMA admits that its arrangement with NFC was a deposit in its financial statements and in its accounting memo. If there was a levy, if there was a lien, then that means there could have been a levy on those assets, right? The phrase is much broader than that. We're talking about, it doesn't talk about, it talks about a deposit arrangement of any kind is in the contractual definition of lien. And that's all that was required is whether there was a deposit arrangement of any kind and their own financial statements and their own SEC filings can see the point. And their accounting memo, GENMA's parent concluded that the payment amount by GENMA meets the definition of asset and it should be accounted for as a long-term deposit on GENMA's balance sheet. And in its SEC filings, it's accounted for as a long-term deposit. And this should not be a surprise because it was clear from the beginning that it's $130 million, every penny of it that GENMA paid NFC was going to go back to GENMA through either rent payments or letter of credit disbursements. And NFC could not keep a penny. And it shouldn't matter whether it was labeled as part of an account at NETXAS with GENMA's title on it or not. That was the functional effect of this agreement. The $130 million was paid to us, but had to go back to GENMA. Every penny was accounted for and effectively had to be used for GENMA's benefit. And that's why their own accountants said this was a GENMA deposit and a GENMA asset. Can you understand, help me understand in a way, the bigger picture of this? Before the events that brought us here, GENMA's parent, Jin Ahn, if that's how you folks pronounce it, was providing the credit support. Once they were no longer willing to do that financially, able to do that, what was GENMA's options? What else would have been out there who would have provided $130 million worth of credit support without some imaginative scheme like this? I guess I don't understand finances involved here. They could have done, they could have had an investment-grade affiliate, provided an uncollateralized letter of credit support. They could have had an affiliate provide, an investment-grade affiliate that provided a sale and lease back. Anticipated that the parent, Jin Ahn, would provide this credit support indefinitely? The credits, the original participation agreement, remember there's $3.1 billion of rent due over the life of 34 years. And these under-lessors want to make sure that they're protected. And so there were a variety of options. The fact that those options ended up shrinking based on the financial stress that NRG and Jin Ahn were under does not mean that the original agreement did not contemplate it, that they could use their cash, their own assets to collateralize and obtain this letter of credit. There's clear testimony in the record from the under-lessors and from GENMA's own treasurer that the whole point of this was that GENMA, they already had, the under-lessors already had security in GENMA's assets. They had, they were all pledged up and they had, so what they were looking to do, and the testimony is unequivocal on this, is to provide incremental credit support above and beyond that asset base to provide additional credit protection. And the fact that the way events turned out made it made it impossible once the parent withdrew its guarantee doesn't mean that the original terms of the agreement required that. There's still ways to perform, you're saying, under the agreement after Jin Ahn backed out. If they had an investment-grade affiliate that could have provided uncollateralized support, if there weren't, you know, there were surety bonds that could have been provided, letters of credit, guarantees, there were different forms of credit support that I understand. I understand the point that once they're under severe financial strain and the parent withdraws a guarantee that their options are few at that point, but that doesn't change the original meaning of the contract. Thank you, sir. Mr. Krachenberg, you've saved us some time for a bottle. Mr. Shanker. May it please the court, Ravi Shankar for Appelli, Jin Ahn, Mid-Atlantic. Let me start with the issue of jurisdiction and begin with an important overarching point. Federal jurisdiction never should have been disputed in this case. The parties have always been diverse and their contract selects a federal court in New York as the exclusive venue for jurisdiction. Accordingly, if New Texas was going to sue it all, it would have to be in New York. It was contractually required to bring that lawsuit in the New York federal court. What New Texas instead did from the jump is breach the payment agreement and sue Genma in New York state court alongside Genma's non-diverse owner lessors. That breach is significant because the current jurisdiction and abstention disputes here only arose after New Texas first breached its contractual obligations to Genma. To this, New Texas's only response is it would have been That, your honors, is legally irrelevant. Parties can contractually agree to, as New Texas did here, to litigate related claims in different forms as a result of a forum selection clause, and New York courts do enforce forum selection clauses under those circumstances. I'd point your honors to the New York state court's decision in Walker-Trustel 993 NYS 2nd 647 as well as the Second Circuit's decision in Phillips 494 F3rd 378. Once New Texas sued in state court, Genma removed based on related to federal jurisdiction, and what followed was a thoughtful process in the lower courts below. First, the New York federal court did what federal district courts should do when faced with questions of related to bankruptcy jurisdiction. It asked the parties to solicit the bankruptcy court's views on jurisdiction. Second, the bankruptcy court found a very close tie, that was those were its words, between the resolution of New Texas's claims and the ultimate consummation of the Genon debtors plan. And there is just no question about the relationship, your honors, of New Texas's claims to Genon's reorganization. I was trial counsel in Genon's bankruptcy, and as anyone who lived that bankruptcy knows, the contractual arrangement at issue in this lawsuit was front and center in the bankruptcy proceedings. In fact, New Texas's filing of this lawsuit followed a 10-day trial spanning two months in which the bankruptcy court heard extensive testimony about the New Texas arrangement, including from New Texas's own managing director, and New Texas's counsel was in the room for all of those proceedings. That trial was so important because no progress could be made in the Genon bankruptcy until the issues related to the New Texas arrangement were resolved. And when the claims were settled and a plan as an initial matter was confirmed, Genma was front and center of that arrangement. Counselor, let me tell you some concerns I have about this. You certainly may well be right. But it seems to me that you have some barriers ahead of you, some hurdles to surmount. One is Craig Storrs, which talks about the importance of confirmation and the claims not being brought in at the time of confirmation, after the time of confirmation. It is also significant, it seems to me, that what's going on in the plan is you're trying to protect Genma's assets. They won't have enough money to satisfy his obligations on the plan. You're looking for bankruptcy court protection of someone who's not in bankruptcy. And it seems to me that the cleaner fit of this Genma itself needed to go into bankruptcy if it wanted bankruptcy court protection after the confirmation of the plan. I may see other hurdles, but help me with those first two. Of course, Your Honor. Your Honor, I think you noted it correctly before. Confirmation is an important milestone within a bankruptcy case, but it's not the end step. And between the point of confirmation and the ultimate consummation of the plan, in other words, this case was further behind the bankruptcy timeline than in U.S. Brass. There are important requirements. U.S. Brass are actually attacking something directly involved with the plan. It was the plan itself that was sought to amend it or something. I'm trying to remember the facts of U.S. Brass. And that's not what we have. We have the ability of someone not in bankruptcy to perform under the plan, but that's not what was going on in U.S. Brass. Yes, Your Honor. So here what's going on is that Genma and the Genma settlement, in which Genma put in consideration, became the focal point of Genon's ability to reorganize. And under Genma's obligation as part of the Genon reorganization, Genma owed a number of obligations, including restructuring the lease obligations, which are issue in this lawsuit. And so when the bankruptcy court, months after Genon had confirmed its plan but still had not made substantial progress to the point of consummation of its plan, was faced with reciprocal claims being now brought by Natixis that would both impair the ability of Genma in order to perform under the confirmed plan of reorganization, as well as directly related to the issues at the heart of the litigation. These are the same mirror claims, Your Honor, that were litigated before. That's when the bankruptcy court made its assessment that these claims, in fact, had a close tie to the ultimate consummation of the Genon plan. And I think, Your Honor, and this is the reason why this precedent fits squarely within the Craig Storrs test, is you look at the process here. When the New York court asked the bankruptcy court to evaluate the relationship of these claims to the bankruptcy, the bankruptcy court was able to make an assessment based on its on-the-ground view and assessment of the progress of the Genon reorganization and the issues as part of that reorganization that had the potential to derail it. In other words, the Natixis arrangement was the flashpoint of the Genon reorganization, and Natixis' claims threatened to impair performance under that obligation and could weaken the support of key creditor constituents to proceed with the plan of the reorganization. And the bankruptcy court had the best focal point to make those decisions. And I'll add, Your Honor, that Genma even offered to present live witnesses to further corroborate the evidence already in the record about the close link here, and to that Natixis objected, and the bankruptcy court found it did not need testimony to confirm what it already knew to be the case. So to get around the bankruptcy court's findings, what we've heard Natixis argue in its appellate briefing and again today, is that Genon ultimately consummated its plan, and Natixis is trying to imply that that proves a lack of connection between its claims and the bankruptcy court, and the bankruptcy case, and I want to take that head-on because it's incorrect for a number of reasons. Let me ask you the third issue, that the no facts or law deriving from the reorganization or the plan were necessary to the claim. Is that present here? I, I, that, that is, that is present here, Your Honor, because part of Genma's, so both Natixis' claims and Genma's defenses both implicate the course of the bankruptcy proceedings. What we've seen Natixis argue is that it points now to the owner lessor's positions, arguments, and even the Genma settlement as being a reason why Genma has breached the payment agreement and the underlying lease obligations. The corollary of that, Your Honor, is that as part of Genma's affirmative defenses, Genma raised defenses such as waiver and latches based upon Natixis' failure to intervene or make any of these issues known within the bankruptcy. So the connection here stems from both the economic substance of the arrangements and their ability to impair the bankruptcy, and there's also a legal overlay, Your Honor, that the claims being argued on both sides do have a very specific bankruptcy overlay, which provides the hook for jurisdiction. So, Your Honor, what I've heard Natixis focus on now is after the fact, Genma was able to consummate its plan. And let me just take that head on, because first, jurisdiction is not a moving target. It is determined upon removal based upon the facts at hand and does not cease to exist if those subsequent events turn out better than expected. That's this circuit's decision at Enron Corporate Securities. Second, that Genma ultimately consummated its plan is not inconsistent with this circuit's task for post-confirmation jurisdiction. The test is claims pertaining to the plan's implementation, and I put the emphasis there on pertaining. Here, Natixis' claims certainly impacted the likelihood of consummation, the likelihood, Judge Southwake, of Genma's abilities to perform under its settlement obligations. Once Natixis filed suit, the betting odds for Genma confirming its plans became worse because these claims were directly related to a settlement that was at the cornerstone of the plan. And the third point here is that if Natixis truly believed that bankruptcy jurisdiction went away upon Genma's plan being consummated, then Natixis should have moved to remand again on that point, but it didn't. Natixis never gave the bankruptcy court the opportunity to explain his prior findings in light of consummation, nor did Natixis ever raise these issues here with the Southern District of Texas, who never weighed in on the jurisdictional questions because Natixis did not raise them below. What Natixis instead did is bet that the lower courts would side with it on the merits, and they didn't. Now Natixis is asking for a do-over in New York State Court, which would have to dismiss this case anyway. That's my initial overarching point, because the parties here are diverse and contractually agreed to litigate their dispute in New York Federal Court. Your Honors, let me pause there on the issue of subject matter jurisdiction before I pivot to mandatory abstention. Abstention is only required when the removed claims cannot have been quote-unquote commenced in federal court, and that requirement is not met here. The parties have always known they were diverse, and Natixis could and should have filed this case in federal court. In response, what Natixis has argued today is that this entire lawsuit, both against GENMA and against the owner-less oars, couldn't have been brought together in federal court. But abstention focuses on the claims that were removed, not what was left behind. And in our briefing, we diagrammed out the text of Section 1334, and I wouldn't want to put a finer point on the legal and pragmatic considerations that corroborate GENMA's textual interpretation. As this circuit concludes... Would you address the issue being made by your friends on the other side about the actual petition for removal that the only reference was to related to jurisdiction and not diversity? How does that fit into this? Yes, Your Honor. So under the text of Section 1334, it focuses on claims that it could have commenced in federal court, meaning the focus is not on what happened in the state court and what was removed. The legal focus is on whether the claims, as they were removed in federal court, could have been brought in federal court in the first place. And that, Your Honor, is addressed head-on in this circuit. I probably haven't expressed myself well on not understanding your response. My concern is the argument made by the other side. I'm not sure their authority is all that strong, that if you're going to remove and you're going assert diversity jurisdiction at some stage, your petition for removal has to assert diversity jurisdiction. And it did not. There's nothing... I didn't search for the word, but I don't think the word's in there. So give me your answer to that alleged problem. Sure, Your Honor. That is not a problem for purposes of mandatory abstention because mandatory abstention solely looks at whether the claims brought in federal court could have been brought in the first place in federal court. And there's precedent from this circuit on that point. Let me ask you this. This is not the answer you're giving, but let me see if the answer I see fits in with what you're saying. It seems to me that when you look at the petition for removal under the statute, you are removing on the basis of related to jurisdiction. But when you look at mandatory abstention, you're not... It's a different issue. And there, could these claims have been brought initially under some... And that doesn't have to be stated in the petition for removal. It's a separate question. That's correct. Are we tracking? We are tracking, Your Honor. We are tracking. I've never said that before, but... Okay. That's right. This is when we're mixing and matching hypotheticals with the fact pattern below. And Your Honor, I would point you to the circuit's decision in TXNB, where the court conducted an abstention analysis on a claim by claim basis and applied supplemental jurisdiction to a claim that had been removed from the state court system, but supplemental jurisdiction was not asserted in the notice of removal. And this is your point, Your Honor, that there, what the Fifth Circuit was doing is it was looking at the counterfactual. Could these claims have been brought from the get-go in the federal court system? So further building out on our textual argument about why abstention is not required in this case, I want to pick up, Judge Smith, on a point you made about Genma's interpretation aligning with Section 1452, which allows parties to remove very specific claims and not cases writ large under Section 1334. And the point here is that there's a statutory harmony between having the abstention analysis track the removal analysis of being able to remove very particular claims. And a third point is that practically this is just not the type of case where deference to the state courts is owed or should be required. Here we have two diverse parties who agreed to an exclusive federal forum selection clause, as I mentioned, and if the federal courts were to abstain, then the New York State Court would need to dismiss as a matter of New York law. The end effect is that Natixis is only able to proceed in federal courts with its claims. Let me... As I understand it, the refusal to abstain is protected by user discretion standard? That's correct, Your Honor. And you saw that, Your Honor, when we had a hearing before the New York District Court, where it was fleshing through its analysis and thought process behind its decision not to abstain. What do you say to the timing analysis? There's a fair amount made by your... by the other side that the New York Court could well have decided this more promptly, efficiently. I don't see how to measure that, but each side tries to measure that for us. What authority there is... What authority do you have of how we should factor in timeliness? Yes, Your Honor. So I think the most thoughtful assessment of timeliness can be found in the Second Circuit's decision in Parmalat. That's at 639 F 3rd 572. And what the Second Circuit did there is it said, first, we need to determine what the needs of the bankruptcy case are. In other words, is there a need for an expedited or expeditious resolution? And then we need to determine whether or not the court and the federal court system can resolve the claims. And here, what we have, based on the record, Your Honor, is findings from the bankruptcy court that these claims threatened to impair the consummation of the Gen On Reorganization. So there was a premium on an expeditious resolution of these claims, coupled with the historical fact that the bankruptcy court was able to resolve the very similar claims that Antixis is bringing here in a matter of five months, from the beginning of motion practice in the bankruptcy court cases to the ultimate end of a trial. And under those fact patterns, Your Honor, there was no court better equipped or better capable or that had historically proven that it could resolve these claims on the timeline required by a bankruptcy, especially when we're looking at that timeline in the case. Your Honor, let me pivot to the merits, because Antixis' position in this lawsuit is that the party's letter of credit arrangement between them was a sham, and Antixis has gone so far to call the entire arrangement a, quote-unquote, mirage. As the lower courts found, it is remarkable to see a global financial institution take the position that it entered into a sham transaction. It didn't. And let me take a step back, Judge Wythe and Judge Southwick, and pick some comments you made. In October 2016, Genma came to Antixis to structure a letter of credit product to satisfy Genma's lease obligations. And Genma did that because it had no parent company in its corporate structure who wasn't in anything other than financial distress. Genma's immediate parent and every parent five steps up the chain ultimately filed for bankruptcy mere months later. So over the next three months, the parties worked hand-in-glove to create a purchase arrangement that was uncollateralized and that worked under the leases. And during those negotiations... Let me ask you this, which is, I'm trying to respond to what I asked your friends on the other side. Other than a parent or some related company, who else could provide security guarantees that didn't require some sort of, I don't want to use the wrong word because it's so important in your case, expenditure of money on the part of Genma? Of course, your honor. Your honor, no one stepped up to the plate who was willing to do it. Who else would other than a corporate relative? Other than a corporate relative, no one. Because no one would have any economic interest in acting as a good Samaritan and backstopping a company where it's not going to get a financial windfall. But when the parent was doing it, it was no out, there was no financial output by Genma to get these credit guarantees, the letters of credit. There's no expenditure by Genma for those letters of credit, from J.P. Morgan, for example? That was incorrect. So what the record shows, your honor, is that even when Genon, the parent, was assembling the letters of credit, it was still charging Genma the fee that J.P. Morgan was charging. In other words, Genon acted as the arranger of the relationship but passed through the financial expenses. There's no argument that violated this arrangement, the sale-lease-back with the parties? Correct, your honor. The owner-less source never made that argument, and that was one of the points we raised in the bankruptcy trial below, that their claims were opportunistic on the issue of breach. It does seem to me that the best argument on the other side is that this was a deposit of $130 million. Yes, you couldn't get it back. Yes, you did everything you could to separate yourself from it, but it was effectively a deposit. Is it a matter of the language of the agreement not being broad enough to cover this well-designed way to handle this? Why isn't it a deposit of $130 million to satisfy the obligation? Sure, your honor. Let me focus on the text, and let me focus on the substance. As a textual matter, a deposit is a very specific language, and it had to be a secure— As defined in the agreement, you mean? Yes, correct. As defined in the agreement, and New York law is clear that sophisticated parties' arrangements are not the types of agreements that should be broadened out. Parties were very intentional in selecting very technical language like deposit and the word lien. I can agree with that. Very technical language, all of it. Very technical language, your honor. That's what happens in a $3 billion arrangement. But let me also get to the substance, your honor, because this is the fundamental difference. There's a fundamental difference between purchasing services and making a deposit. No money was reverting back to Genmont. None of the regulatory requirements were setting up a deposit existed. And in Texas, to hold a deposit had to be registered as a bank, which it did not do in this case. So for those reasons, your honor, we would ask that the court exercise jurisdiction and affirm. All right. Thank you, Mr. Shanker. Thank you, your honor. I want to start by a couple of those merits points and then return back to the subject of jurisdiction. We have not used the term sham transaction in our briefs. The point we're making is this was a very risky transaction with respect to the ownerless holders, and we know that they immediately cried foul when they learned the terms of this agreement. We just say that we protected ourselves, we thought we did, by obtaining warranties, that this didn't violate the sale-lease-back agreements, and by obtaining indemnification. And those are two of those claims. They agreed to take that risk, that this deal went south, and now they're running away from that. On the question of deposit, I want to just return to that exchange. They use the phrase deposit account in some parts of the participation agreements. But in Section 6.3, they use the phrase deposit arrangement of any kind. Very, very broad. And if you look at the overall context of Section 6 of the participation agreements, you have all kinds of provisions in there that are designed to constrain GEMA's ability to sell assets, incur debts, otherwise manage its business, restrict cash flows, etc., because, again, they're trying to protect themselves knowing that they've got 3.1, the ownerless holders have 3.1 billion dollars of rent that is going to be paid over the life of this contract. So they wanted this language to be very broad. It does not require a deposit account like you have a formal deposit account with a bank. Again, they use this phrase in other parts of the agreement, but they use the broadest possible claims here. A brief word about the Foreign Selection Clause, it's kind of gobsmacking that they're invoking that because the entire clause talks about the foreign being in the state of New York, and they're the ones that had this case transferred to Texas in violation of that Foreign Selection Clause. The one thing we agree on in terms of subject matter jurisdiction is you do look at the evidentiary record at the time of the remand decision, and I invite this Court to look at the filings that were before the Southern District of New York, which was the decision maker here, and there's nothing in there to suggest that this case would have any impact on the GEMA settlement agreement and any of that briefing, and as I mentioned before... Let me ask you, you're saying that the New York Court never made such a finding? Is that your point? The New York Court has a one-page order it found related to jurisdiction based on what the Bankruptcy Court said, and again, the Bankruptcy Court didn't make findings here. They invited his views, and his views were shared with the Southern District of New York, but the Southern District of New York was the decision maker here, and so when the Court goes through its analysis, we urge this Court to look at the record as it stood before that district. The Bankruptcy Judge specifically said he wasn't making factual findings. He was sharing his observations, but they were so conclusory as to be almost meaningless. He does... He says, I find that there's a close relationship between this case and the Genon Bankruptcy, but he never explains why. He never explains how this lawsuit would have impacted it, and I know you don't look forward, but the proof is in the pudding and the way everything else played out after that point. Judge Wiener, you asked a about whether this lawsuit has any facts or laws that were associated with the bankruptcy reorganization, and the clear answer is none. These claims have absolutely nothing to do with what transpired in the bank. What about the other two issues? The claims principally dealt with post-confirmation. Well, there's no facts. I mean, the claims were not raised prior to a planned confirmation. The second factor favors us. Here are the letters of credit. The bankruptcy plan was filed before any of this transpired with the letters of credit not coming due and this deal unraveling. The first factor does affect... This was pre-confirmation conduct, but I would say with respect to the credit storage factors, I don't think this exclusive factors and the only factors you look at when you're trying to determine what test applies and how you look at related to jurisdiction. Those were the factors before this court. Every other circuit also, when looking at this question, has held that whether the case involves pre-confirmation conduct or post-confirmation conduct is not what matters. It matters whether the lawsuit is filed pre- or post-confirmation, and that's the Seven Fields case out of the Third Circuit holds that most explicitly and most recently. I see I'm out of time, Your Honors, but I appreciate the opportunity to argue before you. Thank you, Mr. Kestenberg. Your case is under submission. The court will take a brief recess before hearing the final two cases.